IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| KEITH THUNBERG, | ) | Case No. 11 C 50238 |
| | ) | |
| Plaintiff, | ) | |
| | ) | Hon. P. Michael Mahoney |
| v. | ) | U.S. Magistrate Judge |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

Claimant's Motion for Summary Judgment [17] is granted and Defendant's Motion for Summary Judgment [20] is denied. See Memorandum Opinion and Order below for details.

Date: 3/12/2014

_____
Hon. P. Michael Mahoney,
U.S. Magistrate Judge

## MEMORANDUM OPINION AND ORDER

### I.    Introduction

Keith A. Thunberg ("Claimant") seeks judicial review of the Social Security Administration Commissioner's decision to deny his claim for Disability Insurance Benefits ("DIB"), under Title II of the Social Security Act, and Supplemental Security Income ("SSI") benefits, under Title XVI of the Social Security Act. See 42 U.S.C. § 405(g). This matter is before the Magistrate Judge pursuant to the consent of both parties. See 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.

## II. Administrative Proceedings

Claimant filed for SSI and DIB on February 11, 2009, alleging an onset of his disability beginning on May 21, 2004. (Tr. 171.) Claimant's initial claim was denied on May 29, 2009, and denied a second time, upon reconsideration, on November 2, 2009. (Tr. 74, 85.) Claimant then filed a timely request for a hearing before an Administrative Law Judge ("ALJ") on December 11, 2009. (Tr. 85.) His request was granted and a hearing was held before ALJ Robert C. Asbille on June 11, 2010, in Evanston, Illinois. (Tr. 35.) Claimant appeared and testified in person with an attorney present. Vocational expert ("VE"), William M. Newman and psychologist and medical expert ("ME"), Dr. Joseph Cools, were also present for the hearing and testified before the ALJ. (Tr. 34-35, 42, 54.)

Following the hearing, the ALJ denied the Claimant's application in a written decision dated June 17, 2010. (Tr. 28.) Subsequently, the Appeals Council denied Claimant's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-5; 20 C.F.R. §416.1481.) A timely complaint for administrative review of the ALJ's hearing decision was filed. (Tr. 12.) This federal court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383 (c)(3).

## III. Background and Hearing Testimony

Claimant was born on September 8, 1968, making him forty-one years old at the issuance of the ALJ's decision. (Tr. 40.) Claimant reported that he was approximately six-feet and one-inch tall and weighed approximately 215 pounds. (Tr. 41.)

Claimant attended special education classes while he was in middle school. (Tr. 51.) He did not complete his high-school education; he was enrolled through the tenth grade and, as of the hearing, never obtained a G.E.D. diploma. (Tr. 194.)

From 1986 through 1995 he found work as an independent construction contractor. (Tr. 189.) In 1998, he was employed with Wal-Mart, working as a mechanic and sales associate until 2005, after his alleged disability onset. (Tr. 189.) He has not worked since that time and has lived with his sister. (Tr. 41-42.) He claims that he is disabled due to a back injury and because he suffers from depression. (Tr. 188.)

Claimant was the first to testify at the hearing. (Tr. 40.) The ALJ asked Claimant directly, "Sir, would you tell me why you can't work?" (Tr. 44.) Claimant responded that he has "pain that radiates down to [his] lower back . . . into [his] left leg." (Tr. 44.) On a scale of one to ten, Claimant rated his average pain "between a [six] and [nine]" and stated that the "stabbing pain" has only worsened over time. (Tr. 45.) The pain impacts his ability to concentrate and it often interrupts his sleep, usually waking him up several times during the night. (Tr. 52.) Because of his lack of sleep, Claimant usually takes short naps throughout the day. (Tr. 52.)

Despite his pain, Claimant asserted that he generally tries to remain as active as he can. (Tr. 53.) Claimant explained that he can no longer do many of the activities that he used to enjoy: "[f]ishing, hinking, [and] playing football." (Tr. 54.) Claimant testified that he can generally walk up to three quarters of a mile in a day. (Tr. 46.) He is able to do light housework; however, his sister, who is legally blind, does most of the household chores. (Tr. 45-46.) He is able to cook and shop. (Tr. 46.) Nonetheless, Claimant asserted that he spends most of his day "up [and] down out of . . . chairs, moving from the couch to the bed, sitting on the porch, [and] watch[ing]

3

TV." (Tr. 46.) He stated that he currently must lie down, or "sprawl on the couch," as much as seven times a day, that he is only able to stand for fifteen minutes at a time, that he has difficulty walking down stairs, and that he is unable to sit for any extended period. (Tr. 46-48.)

Claimant testified that he was able to drive himself to the hearing and would often drive approximately seven times a week. (Tr. 41.) However, Claimant said that his pain would cause him to shift his position while driving and that he found it necessary to stretch over the steering wheel at times in order to alleviate his discomfort. (Tr. 42.) "I'm very seldom ever in the car for more than [fifteen or twenty] minutes," he said. (Tr. 42.)

Generally, Claimant only takes two medications for his back pain: Norco and Soma. (Tr. 53.) He admitted that he is a smoker but, inconsistent with his medical records, he denied ever using "street drugs." (Tr. 47.) The ALJ also learned that Claimant has not undergone back surgery, primarily due to a lack of funds and insurance coverage; "I need compensation . . . before [the hospital] will register me," Claimant said. (Tr. 48.) Claimant was referred to Dr. Sweet, an orthopedic surgeon, who indicated that he would provide the surgery *pro bono*, however, Claimant has been unable to pay the hospital's registration fee. (Tr. 49.)

The ME, Dr. Cools, was next to testify. (Tr. 54.) The ME testifed concerning psychological symptoms and he stated that he could not comment on "physical problems." (Tr. 61.) He surmised that "with the exception of one period of time when [Claimant] was seen [INAUDIABLE] at the hospital in July 2006, there's been no difficulty with his psychological adjustment other than the reaction to pain." (Tr. 55.) The ME noted Claimant's secondary "chronic pain syndrome" and history with illegal drug (cannabis, cocaine, and amphetamine) abuse and its probable effects on Claimant's mental state and depression. (Tr. 56.) He agreed that Claimant "does fit the pattern . . . of a chronic pain syndrome patient[;] . . . after a period of time

4

dealing with pain . . . people do get depressed." (Tr. 57.) But, the ME opined that Claimant "does not meet a required listing, and I would say the primary . . . criteria that would be affected [by Claimant's depression] would be the attention, concentration, pace, and persistence, and that would be moderately impaired." (Tr. 57.) The ME also noted that it "does not appear to me that there's a drug and alcohol abuse problem at this point." (Tr. 56.)

The ALJ turned to the VE, asking him to describe and categorize Claimant's past work. (Tr. 42.) First, the VE identified Claimant's work as a contractor: "based on the record, he was an impact . . . contractor[;] did installation of floors, carpets, *et cetera*. And the DOT defines the hardwood floor installer as skilled, medium work, with a [Specific Vocational Preparation Rating ("SVP")] of seven, and the carpet-layer as skilled, heavy work, with an SVP of seven." (Tr. 42-43.) Next, the VE analyzed Claimant's work with Wal-Mart: "with the tire-changer person, the DOT defined as semi-skilled and medium, with an SVP of three. [Claimant] performed it [from] heavy to very-heavy range. The sales associate [position] is semi-skilled and light . . . with an SVP of three." (Tr. 44.)

Next, the ALJ posed a number of hypothetical limitations:

> [A]ssume an individual with [Claimant's] age, education, and work experience[.] [A]ssume further a claimant with [Claimant's] medical evidence, that he could do the entire [INAUDIBLE] work except would be limited to lifting [ten] pounds occasionally, [five] pounds frequently, stand no more than two hours in eight hours in divided-up periods, sit six hours out of eight hours, and . . . sit [for] . . . . [twenty] to [thirty] minutes with like a [INAUDIBLE].[1] . . . [Further, the individual is] required to use a cane, postural is occasionally, and no ladders, ropes, or scaffolds, [INAUDIBLE] heights.

(Tr. 62.)

---

[1] Because Claimant consistently testified that he was only able to sit for ten-to-fifteen minutes, the court is unclear how the ALJ came to immediately recommend the twenty-to-thirty minute limitation in this hypothetical; the ALJ did not provide a medical citation. (Tr. 46-48,62).

The ALJ asked if the hypothetical person would be able to perform Claimant's past work. (Tr. 63.) The VE answered, "No." (Tr. 63.) However, the VE began to consider sedentary level work that the hypothetical individual could perform. (Tr. 63.) He stated that the ALJ's example was "on the borderline:" "[g]enerally, when [one is] doing sedentary[-]level work, [one] need[s] to maintain a position of at least [thirty] to [forty-five] minutes at a time," he testified. (Tr. 63.) "Okay, so let's say with that limitation, there's no work?" asked the ALJ. (Tr. 63.) The VE agreed that there would be no work available for an individual who can only sit for twenty or thirty minutes. (Tr. 63.)

Therefore, a second, less-restrictive hypothetical was then put forward by the ALJ: "use [thirty] to [forty] minutes instead of twenty to thirty." (Tr. 63.) The VE identified three sedentary, unskilled positions that such an individual could perform: a food and beverage order clerk, sorter, and assembler. (Tr. 63-64.) The VE stated that these jobs existed in substantial numbers, even after he reduced the numbers by thirty percent. (Tr. 64.) "[T]he reason I say that" the VE explained, "is . . . in some of these positions, a person has to get their own supplies" and Claimant is restricted by his cane. (Tr. 64.)

The ALJ then proposed a third, more restrictive hypothetical, asking the VE to consider an individual that is limited to "simple, routine tasks." (Tr. 64.) The VE stated that the new condition would not change his findings and that his testimony had been consistent with the DOT. (Tr. 64-65.)

Claimant's attorney then asked the VE if his findings would change "if the individual can [only sit for] less than [a total of] two [hours]." (Tr. 66.) The VE answered in the affirmative: "that would eliminate their ability to do the sedentary work." (Tr. 66.)

Next, Claimant's attorney asked the VE if the individual would be precluded if he would need to shift positions at will from sitting to standing and *vice versa*. (Tr. 67.) Again, the VE stated that the person would not be able to perform sedentary work, as it required one to maintain a position for thirty to forty-five minutes. (Tr. 67.)

Finally, the Claimant's attorney asked the VE to consider a person who would need to lie down at unpredictable intervals for approximately ten minutes, two or three times a day. (Tr. 68.) The VE concluded that "these jobs would not allow . . . lying down." (Tr. 68.) "So[,] irregardless [sic] of the amount of time, [lying down] could not be something that would be allowed . . . ." (Tr. 68.)

## IV.    **Medical Evidence**

On July 8, 2004, Claimant first underwent a lumbar MRI, showing a "minimal disk bulge" at C4-C5, "but no nerve root compromise, or spinal stenosis." (Tr. 271.) Dr. Stephen S. Bernsten, M.D. wrote that other findings may show signs of a "spinal dural arteriovenous fistula."[2] "There is, however, no evidence for definite abnormal signal within the [spinal] cord . . . . There is no discrete disk herniation, and there are no areas of abnormal contrast enhancement," Dr. Bernsten wrote. (Tr. 270.) "There are degenerative disk changes at L4-L5 which are very mild," he added. (Tr. 265.) A month later, on August 5, 2004, Dr. Bernsten noted "no discrete disk herniation . . . [and] no areas of abnormal contrast enhancement." (Tr. 270.) It is unclear from these records what treatment was recommended at the time.

---

[2] "Dural arteriovenous fistulas, a type of arteriovenous malformation, are abnormal connections between arteries and the tough covering over the spinal cord (dura) and a draining vein;" http://www.mayoclinic.org/spinal-arteriovenous-malformations/

The earliest medical records that Claimant provides all originate from Crusader Clinic in Rockford, Illinois throughout the year 2004. (Tr. 354-393.) Unfortunately, many of the records from Crusader are handwritten and difficult to decipher. (Tr. 354-393.) Even so, the notes appear to relate to Claimant's prior workers' compensation case, arising after Claimant sustained a back injury while he was working at Wal-Mart. (Tr. 354, 377.) The most instructive material from that time period appears to be summarized by orthopedic specialist, Dr. Forrest Riordan, M.D., in a letter, written on January 4, 2005, addressed to Claimant's attorney. (Tr. 378.)

In the letter, Dr. Riordan refers to his initial examination of Claimant on December 21, 2004; Claimant reported that he had been employed at Wal-Mart and often worked in the automotive department's service pit. (Tr. 377.) At the time, Claimant explained that "[at] the beginning of May, he was in the pit and turned and twisted . . . . and felt a sharp pain in his lumbar spine and a shooting pain down the left leg." (Tr. 378.) However, the pain "gradually disappeared except for some aching . . . . [and some] low[-]back pain with pain down to the calf periodically." (Tr. 378.) Dr. Riordan diagnosed Claimant with a "small herniated disc at L4-[L]5 level into the foraminal region with some facet arthrosis[,] . . . spasm of the left piriformis[,] . . . [and] a marked Trendelenburg gait." (Tr. 382.) Dr. Riordan opined that Claimant was not able to return to work and recommended that Claimant undergo physical therapy treatments. (Tr. 383-384.) The records do not appear to indicate whether Claimant obtained that treatment.

Claimant was still suffering back pain and obtained another MRI the following year, on August 15, 2005. (Tr. 266.) A new MRI was compared to the 2004 scan, showing that "the vertebral bodies are of relatively normal signal intensity and height. The disc spaces are fairly well hydrated, except for some minimal disk desiccation at L4-L5." (Tr. 266.) Specifically, the

L4-L5 image "demonstrates [a] prominent central disk protrusion [that] does contact the L5 nerve root . . . . and may contact the L4 nerve root," Dr. Bernsten wrote. (Tr. 266.) "This has progressed since the previous exam of [July 8, 2004]. There are also associated left-sided facet degenerative changes and neural foraminal narrowing." (Tr. 266.) In his summary, Dr. Bernsten reported that "[t]here are degenerative disk changes L4-L5 which are very mild." (Tr. 355.)

Months earlier, on March 30, 2005, Dr. Fernando Irizarry, M.D. at Crusader stated that "[Claimant] needs orthopedic surgery but needs to quit smoking and it will be scheduled." Nevertheless, in a handwritten note from Crusader Clinic, dated September 8, 2005, it states that two doctors from the Rockford Spine Center, Drs. Roh and Silva, opined that Claimant was "not a surgical candidate" and "would not benefit from [surgery]." (Tr. 344.)

On July, 15, 2006, Claimant entered the emergency department following reports of suicidal ideation and overdose, having ingested cocaine, alcohol, Neurontin, and Celebrex. (Tr. 254.) During his examination, Dr. Kamlesh Ramchandani, M.D., noted a medical history of "diskogenic disease of [Claimant's] lumbar spine" was present, but stated that Claimant had no complaints of back pain at the time. (Tr. 254.) Dr. Ramchandani wrote that Claimant needed to be evaluated by the hospital's Crisis Team and that he "need[ed] to be transferred to Singer [Mental Hospital]." (Tr. 255.) It is unclear whether Claimant was ever transferred within the records provided.

Treating physician, Dr. Riordan, completed a Department of Human Services Physical Assessment Form on October 30, 2006. (Tr. 373.) In his report, he was asked to "grade" Claimant's ability to perform specific physical activities. (Tr. 376.) A grade of "A" represents a minimal or no limitation; a grade of "B" represents "up to [twenty percent] reduced capacity;" a

9

grade of "C" means is less than fifty percent reduced capacity; a grade of "D" means "more than [fifty percent] reduced capacity;" and so on.[3] (Tr. 376.) Dr. Riordan assigned the following grades:

| | |
|---|---|
| • Walking B<br>• Bending C<br>• Standing B<br>• Stooping C<br>• Sitting B<br>• Turning B<br>• Climbing C | • Pushing C<br>• Pulling C<br>• Speaking A<br>• Travel . . . N/A<br>• Fine Manipulations A<br>• Gross (Grasping…) A<br>• Finger Dexterity A |

(Tr. 376.)

Claimant's ability to perform "physical activities of daily living" was check-marked "C." Dr. Riordan also specified that "weightlifting during an [eight]-hour day, [five] days a week" should be "[n]o more than [ten pounds] at a time." (Tr. 376.)

Claimant underwent another MRI on November 29, 2006. (Tr. 263.) The results of which were compared against the August 2005 MRI. (Tr. 263.) Dr. Eric A. Cuasay, M.D. found "[v]ertebral bodies demonstrate normal height and configuration without fracture or compression deformities. Minimal degenerative changes are again noted at L4-L5. There is mild facet arthrosis at L4 through SI." (Tr. 263.) Overall, Dr. Cuasay found that the results were "essentially unchanged" from the prior August 2005 MRI. (Tr. 263.)

After reporting back pain and leg weakness on March 7, 2007, Claimant underwent yet another MRI. (Tr. 281.) Dr. Riordan analyzed the results and summarized that "there is associate venous congestion within the dietal spinal cord and conus as evidenced by ill-defined increased

---

[3] Many of the precise definitions, not directly quoted here, are completely illegible in the record, due to a poor copy.

signal . . . . Right lateral disc herniation at L3-L4 with resultant neural foraminal compromise on that side of at least moderate degree . . . . Left lateral disc herniation at L4-L5 resulting in at least moderate neural foraminal compromise." (Tr. 289.)

On April 28, 2009, Claimant's mental state was evaluated by Disability Determination Services ["DDS"] psychiatrist, Dr. Gerald K. Hoffman, M.D., F.A.P.A.. (Tr. 292.) Dr. Hoffman reviewed Claimant's medical history and described Claimant as "a very unhappy[,] divorced 40 year[-]old Caucasian using a cane in his left hand and walking with great difficulty in a rather dramatic way, complaining of back pain." (Tr. 292.) "He has applied three times in the past for SSI; unhappy about denial," the doctor continued. (Tr. 292.)

During the examination, Claimant asserted that he is depressed and stays in bed "[ninety percent] of the time." (Tr. 292.) Claimant represented that he can no longer do his favorite activities and used to take "pride in [his] former physical abilities," as needed that to keep his self-esteem. (Tr. 292.) He also reported a lack of ability to concentrate and a past diagnosis of Attention Deficit Hyperactivity Disorder ("ADHD"). Claimant admitted that he had a past drug and alcohol problem, but said that he had not used drugs in years. (Tr. 293.) Additionally, Claimant stated that he is able to walk about a quarter mile on a good day and can sit for approximately thirty minutes. (Tr. 293.) When asked about employment, Claimant denied looking for work because "there is not much out there where [he is] at." (Tr. 293.) Dr. Hoffman reported no substantial memory of cognitive deficiencies. (Tr. 293.) Following the interview, Dr. Hoffman diagnosed Claimant with "Axis I Pain Disorder Associated With Both Psychological Factors and a General Medical Condition (orthopedic)," "Adjustment Disorder With Depressed Mood secondary to chronic pain," "Alcohol abuse," and ADHD. (Tr. 293.)

On. May 12, 2009, Claimant underwent a physical examination by DDS physician Dr. Kamlesh P. Ramchandani, M.D.. (Tr. 295.) Claimant reported experiencing chronic back-pain and depression for approximately two years. (Tr. 295.) Dr. Ramchandani noted that Claimant was "alert, in pain, walking stiffly and slowly favoring his right leg, leaning on [his] cane while walking." (Tr. 296.) Claimant was able to stand on his heels and toes. (Tr. 296.) He was not able to walk on his heels and toes, due to his pain. (Tr. 296.) He could squat and return standing "with assistance" and was able to get himself on and off of the examination table (Tr. 296.) Claimant also had no difficulty making a fist, picking up objects, opening and closing the door, "flip pages," or opposing his thumb and fingers. (Tr. 296.) Dr. Ramchandani diagnosed Claimant with "[l]umbar arthralgia secondary to herniated disk of the lumbar spine with radiculopathy of the right lower extremity, [a]rthralgia of the dorsal spine secondary to AV malformation, and depression without suicidal tendencies." (Tr. 297.)

DDS physician, Dr. Michele Womontree, Psy. D., reviewed Claimant's medical records and completed a Psychiatric Review Technique Form on May 14, 2009. (Tr. 301.) In her review, she marked Claimant's restriction of activities of daily living and difficulties in maintaining concentration, persistence, or pace as "mild." (Tr. 311.) In Dr. Womontree's opinion, Claimant suffered no additional mental functional limitations. (Tr. 311.)

Non-examining DDS medical consultant, Dr. Victoria Dow, M.D., reviewed Claimant's medical records and filed a Physical Residual Functional Capacity ("RFC") Assessment on May 27, 2009. (Tr. 315.) As to Claimant's exertional limitations, Dr. Dow found that Claimant could

- occasionally lift and carry ten pounds,
- frequently lift and carry less than ten pounds,
- stand and walk for at least two-hour intervals in an eight-hour workday,
- sit for a total of six hours in an eight-hour workday, and
- push or pull with limited capacity in his upper extremeties.

(Tr. 316.)

In the category of postural limitations, Dr. Dow marked that Claimant has the capacity to

- frequently climb ramps and stairs;
- occasionally climb ladders, ropes, and scaffolds; and
- frequently balance.

(Tr. 317.)

The categories of stooping, kneeling, crouching, and crawling were all left unchecked; however,

the doctor wrote that Claimant suffered "no other postural limitations." (Tr. 317.) Dr. Dow

repeated Dr. Ramchandani's recent findings, concluding that

> [Claimant] walked stiffly[,] leaning on a cane, [and] favoring [his
> right] leg. [Claimant is able] to heel/toe stand, [but] is unable to
> walk on [his heels and toes, secondary] to back pain. [He is able]
> to squat and get up . . . with [assistance and] get on and off [the
> examination] table with no difficulty . . . .
>
> [Claimant's] report of limitations appears to be excessive and only
> partially credible when compared to the medical evidence in the
> file. [Claimant] does have [a history] that could account for some
> pain in the back, but there is nothing in the [records] to indicate the
> need for a cane. [Claimant] notes [that] he can walk 300 [yards
> without] the cane. The cane is not required or medically
> prescribed, but is useful for balance [and] pain.

(Tr. 322.)

Afterwards, Claimant filed for reconsideration of the RFC report. (Tr. 323.) DDS

physicians, Drs. Albright and Havens, affirmed Dr. Dow's findings on October 29 and October

22, 2009. (Tr. 325.)

The following year, Claimant returned to Dr. Riordan at Crusader Clinic on March 3, 2010, regarding his back pain. (Tr. 395.) Dr. Riordan noted that Claimant was experiencing lumbar pain "along with some buttock triad, which is now very minimal." (Tr. 395.) Claimant complained also of numbness, tingling, and pain down his left leg. (Tr. 395.) "Walking is somewhat limited and [Claimant would] probably [be comfortable walking four blocks] or less . . . . [and sitting] [i]n a sterile[,] hard chair for about [ten-to-fifteen] minutes," Dr. Riordan reported. (Tr. 395.) Claimant was diagnosed with "[l]umbosacral spondylosis without myelopathy," "congenial anomaly of the peripheral vascular system," and "muscular wasting and disuse atrophy." (Tr. 395.) Dr. Riordan refilled Claimant's Norco and prescribed Flexeril. (Tr. 395.) Claimant was to follow-up in two months, after Claimant underwent another MRI on May 4, 2010. (Tr. 395.)

Dr. Mark Traill, M.D., examined the results of the new MRI and found that "prominent, serpiginous vessels [were] again seen extending from the conus through the filum terminalis to the L3-L4 disc space . . . . [and a] new, far lateral disc protrusion . . . on the right side . . . narrows the adjacent foramen and compresses the right L3 nerve root." (Tr. 403.)

During the follow-up appointment on May 13, 2010, Dr. Riordan reported that

> [Claimant] . . . has been seen in the past for back pain with mobile radiographic studies, which show a lot of vascular changes in the midthoracic down through the L3-[L]4 level and some slight disc protrusion at the 34 and 45 levels with no significant clinical findings to go along with these radiographic findings . . . . He continues to show the nerve lesion of the right lateral thigh secondary to pinching of the nerve . . . He . . . has had some numbness of the L4 and L5 levels of the left leg . . . . He has some evidence of . . . sacroiliac arthritis and a little gluteal weakness, but not very significant and he . . . does not show a significant piriformis spasm or numbness, tingling, or pain down the legs as a result of the piriformis compressing the sciatic nerve. He does have some spasm in the left midthoracic area . . . . [Overall,] [w]e tend to have a collection of unrelated findings, which do not make for a

14

good diagnosis at the present time . . . . It would be my suggestion to have Dr. Sweet, [sic] [an orthopedic spine surgeon,] take a look at this gentleman.

(Tr. 400.)

Following the examination, Dr. Riordan completed a RFC worksheet entitled "Medical

Opinion Re: Ability to do Work-Related Activities (Physical)" and marked that Claimant is only

able to

- lift and carry on twenty pounds an occasional basis;
- lift and carry ten pounds on a frequent basis;
- stand and walk for a total less than two hours;
- sit for less than a total of two hours;
- sit for ten minutes before needing to change position;
- stand for five-to-ten minutes before needing to change position; and
- occasionally twist, bend, and crouch.

(Tr. 397-398.)

He also opined that Claimant's capacity to reach overhead and manipulate and feel with his

fingers was negatively affected by his impairment. (Tr. 399.) Additionally, Dr. Riordan asserted

that Claimant must be allowed to

- walk around every fifteen minutes for at least five minutes at a time,
- shift positions at will,
- lie down at unpredictable intervals two-to-three times during an eight-hour workday, and
- avoid ladders and only minimally use the stairs.

(Tr. 397-398.)

According to Dr. Riordan's report, Claimant must avoid concentrated exposure to extreme cold,

heat, and humidity and avoid even moderate exposure to potential workplace hazards, such as

heights and dangerous machinery. (Tr. 399.)

## V.     Standard of Review

The court may affirm, modify, or reverse the ALJ's decision outright, or remand the proceeding for rehearing or hearing of additional evidence. 42 U.S.C. § 405(g). The ALJ's legal conclusions are reviewed *de novo*. *Binion v. Charter,* 108 F.3d 780, 782 (7th Cir. 1997). However, the court "may not decide the facts anew, reweigh the evidence[,] or substitute its own judgment for that of the [ALJ]." *Id.* The duties to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide the case are entrusted to the ALJ and this Court cannot substitute its own opinion or findings in place of the ALJ. *Schoenfeld v. Apfel*, 237 F.3d 788, 793 (7th Cir. 2001) ("Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the responsibility for that decision falls on the Commissioner.").

If the ALJ's decision is supported by substantial evidence, it is conclusive and this court must affirm. 42 U.S.C. § 405(g); *see also Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). "Substantial evidence" is "evidence which a reasonable mind would accept as adequate to support a conclusion." *Binion*, 108 F.3d at 782. If the ALJ identifies supporting evidence in the record and builds a "logical bridge" from that evidence to the conclusion, the ALJ's findings are supported by substantial evidence. *Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005). However, if the ALJ's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

## VI.    Framework for Decision

"Disabled" is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). A physical or mental impairment is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

The ALJ normally proceeds through as many as five steps in determining whether a claimant is disabled. *See* 20 C.F.R. § 404.1520. The ALJ sequentially determines the following: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets or is medically equivalent to an impairment in the Commissioner's Listing of Impairments; (4) whether the claimant is capable of performing work which the claimant performed in the past; and (5) whether any other work exists in significant numbers in the national economy which accommodates the claimant's residual functional capacity and vocational factors.

## VII.    Analysis

### A.    Step One: Is Claimant Currently Engaged in Substantial Gainful Activity?

At Step One, the ALJ determines whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). Substantial gainful activity is work that involves doing significant and productive physical or mental duties that are done, or intended to be done for pay

or profit. 20 C.F.R. § 404.1510. If the claimant is engaged in substantial gainful activity, he or she is found not disabled, regardless of medical condition, age, education, or work experience, and the inquiry ends; if not, the inquiry proceeds to Step Two.

Here, although the Claimant worked in some part-time capacity in 2005, the ALJ found that Claimant had not engaged in substantial gainful activity since May 21, 2004. (Tr. 18.) Neither party takes issue with this finding and it is supported by substantial record evidence. (Tr. 354, 377.) Therefore, the court affirms the ALJ's Step-One determination and the analysis continues to Step Two.

## B. Step Two: Does Claimant Suffer From a Severe Impairment?

Step Two requires a determination whether the claimant is suffering from a severe impairment. 20 C.F.R. § 404 1520 (a)(ii). A severe impairment is one which significantly limits a claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520 (c). The claimant's age, education, and work experience are not considered in making a Step Two severity determination. *Id.* If the claimant suffers a severe impairment, then the inquiry moves on to Step Three; if not, then the claimant is found to be not disabled, and the inquiry ends. *Id.*

In this case, the ALJ found that the Claimant has the following severe impairments: "degenerative disc disease of the lumbar spine with disc herniations and vascular malformation, depression, and substance abuse." (Tr. 18.) Claimant does not dispute this finding and it is supported by substantial record evidence. Therefore, the court affirms the ALJ's Step-Two finding and the analysis moves to Step Three.

## C. Step Three: Does Claimant's Impairment Meet or Medically Equal an Impairment in the Commissioner's Listing of Impairments?

At Step Three, the claimant's impairment is compared to those listed in 20 C.F.R. pt. 404, subpt. P, app. 1. The listings describe, for each of the body's major systems, impairments which are considered severe enough *per se* to prevent a person from doing significant gainful activity. 20 C.F.R. § 404.1525 (a). The listings streamline the decision process by identifying certain disabled claimants without need to continue the inquiry. *Bowen v. New York*, 476 U.S. 467 (1986). Accordingly, if the claimant's impairment meets or is medically equivalent to a listed impairment, then the claimant is found to be disabled and the inquiry ends; if not, the inquiry moves on to Step Four.

Here, the ALJ found that Claimant does not meet or medically equal a listed section, specifically because Claimant's "back disorders . . . do not result in the compromise of a nerve root or the spinal cord with evidence of root compression, spinal arachoiditis, or lumbar spinal stenosis, resulting in an inability to ambulate effectively." (Tr. 19.)

"With regard to concentration, persistence[,] or pace, [Claimant] has no more than moderate difficulties," the ALJ continued. "[Claimant] reported that he is unable to finish tasks he begins and often loses his concentration, but he is able to go grocery shopping, follow television shows, and follow written and spoken [directions] relatively well." (Tr. 19.)

Again, the parties do not dispute these findings and the court affirms the ALJ's Step-Three determination.

**D.    Step Four: Is the Claimant Capable of Performing Work Which the Claimant Performed in the Past?**

In performing the analysis for Step Four, the ALJ determines whether the claimant's

residual functional capacity ("RFC") allows the claimant to return to past relevant work.

Residual functional capacity is a measure of the abilities which the claimant retains despite his or

her impairments. 20 C.F.R. § 404.1545 (a). The RFC assessment is based upon all of the relevant

evidence, including objective medical evidence, treatment, physicians' opinions and

observations, and the claimant's own statements about his limitations. *Id.* Although medical

opinions bear strongly upon the determination of RFC, they are not conclusive; the determination

is left to the ALJ who must resolve any discrepancies in the evidence and base a decision upon

the record as a whole. 20 C.F.R. § 404.1527 (e)(2); *see Diaz v. Chater*, 55 F.3d 300, 306 (7th

Cir. 1995).

Here, the ALJ determined that Claimant has the RFC to

> lift and carry up to five pounds frequently and ten pounds
> occasionally; stand and walk two hours [at a time] . . . ; sit for [a
> total of] six [hours] . . . with [a] sit [or] stand option alternating
> every thirty to forty-five minutes; needs to use a cane; and perform
> postural movements no more than occasionally[,] but cannot climb
> ladders, ropes, or scaffolds; must avoid exposure to unprotected
> heights; and can perform no more than simple, routine tasks.

(Tr. 20.)

The ALJ found that this RFC would not allow Claimant to perform any past relevant work but

would allow sedentary work. (Tr.20-21.) In response, Claimant now asserts that the ALJ

improperly dismisses the opinion of Claimant's treating physician, Dr. Riordan, who found that

Claimant only has the ability to sit and stand for less than two hours in an eight-hour workday.

Dr. Riordan also opined that Claimant can only sit for ten minutes and stand for five-to-ten

20

minutes before needing to change position, must lie down at unpredictable intervals two-to-three times during an eight-hour workday, and must have the ability to stand up and sit down "at will." (Tr. 389.) These findings are critical as the VE testified that they would eliminate the possibility of any employment, including sedentary work.

The ALJ supports his deviation as follows:

> [Dr. Riordan's] opinion is given little weight as it is not consistent with the record as a whole . . . . [Dr. Riordan] opines that [C]laimant can stand, sit[,] and walk a total of less than two hours every day. This implies that [C]laimant would be laying down most of the day. I do not find that the record as a whole supports the conclusion that [C]laimant is spending most of the day in bed.

(Tr. 25-26.)

This ALJ's reasoning seems odd. If a claimant is limited to sitting or standing for less than two hours, it does not *necessarily* follow that the claimant is required to lie in bed when not sitting or standing. For instance, the claimant may recline in a chair or "sprawl" on the couch, as Claimant stated during his testimony. (Tr. 46.) Although the ALJ finds that "the record as a whole" does not support the Dr. Riordan's limitations, the ALJ never explains *how or where* the record is inconsistent. The court is left guessing as to which part of the record the ALJ relies. It is vital that the ALJ support his findings with substantial record evidence. The statement that "Dr. Riordan's opinion is not supported by the record as a whole," without more, does not suffice. The ALJ has not built a logical bridge to support his opinion.

The ALJ does refer to the non-examining agency doctor's assessment: "[t]he State agency physician opined that [Claimant] is limited to a reduced range of sedentary work. This opinion is given significant weight as the State agency physician was able to review other evidence and the opinion is consistent with other evidence." (Tr. 26.) This begs the question: "What other evidence?"

These statements serve as the substantive portion of the ALJ's "analysis" concerning the "sit and stand" RFC finding. The court finds that this explanation does not serve as a sufficient "logical bridge." Certainly, an "ALJ may discount a treating physician's medical opinion . . . as long as he 'minimally articulate[s] his reasons for crediting or rejecting evidence of disability.'" *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) (internal citations omitted). The ALJ may discount the opinion of the treating physician so long as he provides good reasons for doing so. 20 C.F.R. § 404.1527(d)(2); *Clifford*, 227 F.3d at 870; *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011); *Goins v. Colvin*, 12 C 4057, 2013 WL 5609336 (N.D. Ill. Oct. 11, 2013). But here, the ALJ only states that "the State agency physician" - nevermind which one - came to a different conclusion than Claimant's treating physician. *See* (Tr. 25-26.) The ALJ provides no actual, *specific medical evidence* for discounting Dr. Riordan's opinions from May 2010.

To be sure, the ALJ spends a great deal of time summarizing and highlighting certain medical records earlier in his opinion. (Tr. 21-25.) Yet, in his *analysis* he repeatedly refers to "the record as a whole." He does not directly connect that evidence - or build a "bridge" - to his findings. Therefore, the court agrees with the Claimant's contention that the ALJ improperly dismissed the treating physician's opinion.

## E.     Step Five: Is Claimant Capable of Performing Work Existing in Substantial Numbers in the National Economy?

At Step Five, the ALJ must establish that Claimant's RFC allows Claimant to engage in work found in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(f), 404.1566. The ALJ may carry this burden by relying upon the VE's testimony, or by showing that Claimant's RFC, age, education, and work experience coincide exactly with a rule in the Medical-Vocational Guidelines. *See* 20 C.F.R. Ch. III, Part 404 Subpart P, Appendix 2; *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987); Social Security Law and Practice, Volume 3, § 43:1. If the ALJ establishes that sufficient work exists in the national economy that Claimant is qualified and able to perform, then Claimant will be found "not disabled." If no such work exists, Claimant will be found to be disabled.

In this case, the ALJ found that there are jobs that exist in significant numbers in the national economy that Claimant can perform. (Tr. 27.) The ALJ relies on the VE's hearing testimony, identifying three positions that an individual with Claimant's vocational profile and RFC could perform: food and beverage clerk (12,250 jobs), sorter (22,900 jobs), and assembler (19,648 jobs). (Tr. 27, 62-64.) The court has already found fault with the ALJ's RFC analysis; however, there are other problems present here in Step Five.

Claimant challenges the ALJ's hypothetical questions posed to the VE at the 2010 hearing because the hypotheticals failed to include Claimant's moderate limitations of "concentration, persistence, and pace." (Tr. 20, 26, 62-64.) The Commissioner argues that the limitation should not be considered because the limitations are not a part of the ALJ's RFC finding. The court disagrees. Although not specifically contained within the RFC finding itself,

the ALJ repeated that Claimant's depression would cause his attention, concentration, persistence and pace to be moderately impaired, based on the ME's hearing testimony within his Step-Four RFC analysis. (Tr. 26.)

It is well-established within the Seventh Circuit that "[h]ypothetical questions posed to vocational experts ordinarily must include *all* limitations supported by medical evidence in the record." *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002) (emphasis in original); *See also Cass v. Shalala*, 8 F.3d 552, 555–56 (7th Cir.1993). "The reason for the rule is to ensure that the [VE] does not refer to jobs that the applicant cannot work because the expert did not know the full range of the applicant's limitations." *Steele*, 290 F.3d at 942.

> The general rule is that the ALJ must alert the VE to all the limitations of the claimant, but there is no literal requirement that the terms "concentration, persistence or pace" be used. *O'Connor– Spinner v. Astrue*, 627 F.3d 614, 619–20 (N.D. Ill. 2010). *See also Martinez v. Astrue*, 2010 WL 1292491, at \*12 (N.D. Ill. 2010) (rejecting plaintiff's contention that an ALJ may never use the terms "unskilled, simple, repetitive, [or] routine" in forming hypothetical questions to the vocational expert).
>
> For instance, a VE's knowledge about the claimant's mental limitations will be assumed if the record reflects that the VE independently reviewed the medical record or heard direct testimony about those limitations. *O'Connor-Spinner*, 627 F.3d at 619. However[,] this exception [does] not apply to cases where the ALJ asked increasingly restrictive questions, since it is inferred that the focus would be on the hypotheticals and not the record. *Id.*
>
> *Adams v. Astrue*, 880 F. Supp. 2d 895, 912 (N.D. Ill. 2012)

Here, the ALJ's hypotheticals did not include the limitations in regards to concentration, persistence, and pace, but added limitations to "simple, repetitive tasks." (Tr. 62-64.) "[L]imiting a hypothetical to simple, repetitive work does not necessarily address deficiencies of concentration, persistence, and pace." *O'Conner-Spinner*, 627 F.3d at 620. Still, the VE was

present to hear the ME's testimony concerning the limitation and therefore the court could assume that the VE's hypothetical accounted for limitations in Claimant's concentration, persistence, and pace. (Tr. 35, 57.) However, during this hearing, the ALJ proceeded to pose several hypothetical questions of varying restrictions to the VE. (Tr. 62-65.) First the ALJ asked the VE to consider and individual with the ability to sit for only twenty to thirty minutes, among other impairments. (Tr. 62.) Next, upon finding that the original hypothetical would likely preclude even sedentary work, the ALJ asked about an individual with the ability to sit for thirty or forty-five minutes. (Tr. 63.) Finally, as a third hypothetical, the ALJ asked the VE to consider with the additional increased restriction to only perform "simple, routine tasks." (Tr. 64.) Therefore, the court assumes that the VE's focus was shifted away from the ME's limitations and narrowly fixed upon the new hypotheticals. Similar to the *Adams* case,

> [i]t cannot be said that the error was harmless as the VE depended on the ALJ to frame the claimant's limitations in order to supply the work that could be performed. Due to this failure, it is unclear if the VE properly identified jobs that [Claimant] could perform. Because it cannot be ascertained whether the VE's testimony represents substantial evidence, a remand is required. *See O'Connor-Spinner,* 627 F.3d at 620–21 (remanding where the hypothetical did not fully address the limitations of the claimant and thus could not "assure reviewing courts that the VE's testimony constitutes substantial evidence of the jobs a claimant can do"); *See also Young v. Barnhart,* 362 F.3d 995, 1004-05 (7th Cir. 2004) (holding that when a hypothetical question to the VE is "fundamentally flawed because it is limited to the facts presented in the question and does not include all of the limitations supported by medical evidence in the record, the decision of the ALJ that a claimant can adjust to other work in the economy cannot stand").

*Adams*, 880 F. Supp. 2d at 913.

Here, there is no indication that the VE accounted for moderate limitations in Claimant's ability to maintain concentration, persistence, or pace in his employment analysis. In light of the foregoing reasons, the court cannot find that the ALJ's Step-Five determination is supported by substantial evidence and the issue must be addressed on remand.

## VIII.  Conclusion

For the reasons provided throughout this opinion and order, the court grants Claimant's Motion for Summary Judgment and denies Defendant's Motion for Summary Judgment. This matter should be reversed and remanded pursuant to sentence four of 42 U.S.C. § 405(g) with instructions that the ALJ conduct further administrative proceedings in accordance with this opinion.

**ENTER:**

_____
**P. Michael Mahoney, Magistrate Judge**
**United States District Court**

**DATE:**      **3/12/2014**